# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

FILED
MAY 14 2003

| | |
|---|---|
| MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, | |
| Plaintiff, | Case No. 03 C 3149 |
| v. | District Judge Castillo |
| MARK A. PIGNOTTI, | Magistrate Judge Mason |
| Defendant. | |

DOCKETED
MAY 15 2003

## DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

Mark Pignotti's clientele is made up almost entirely of family, friends, social acquaintances, friend-of-friend referrals, and other relationships that Mr. Pignotti has developed on his own through independent networking, cold-calling and the like. In total, at least 70% of his clients are clients that Mr. Pignotti personally developed and brought to Merrill. These are not clients that Merrill simply gave Mr. Pignotti to service. These are clients whose relationship is with Mr. Pignotti, personally, not with the company. They are clients who were at Merrill because Mr. Pignotti was at Merrill. (See Pignotti Aff. §B.)[1]

Now that Mr. Pignotti has left Merrill, those clients would reasonably expect Mr. Pignotti to inform them of that fact immediately – it is material information to an investor-client – and to let them know how he can now be reached. So that is what he did: he promptly provided his change-of-employment information to his clients. And that is *all* that he did. He did *not* solicit a single one of his clients to join him at his new employer. The complete absence of any competent evidence to the contrary in Merrill's submissions to the Court is telling.

Mr. Pignotti has done nothing wrong. The Merrill Lynch form employment agreement does not bar Mr. Pignotti's change-of-employment informational client contacts. It only bans "solicitations," a term which numerous courts have held does not – and could not, without

---

[1] The Affidavit of Mark A. Pignotti, which is attached hereto as Exhibit 1, contains a more detailed recitation of facts. For the Court's convenience, defendant also is submitting a separately bound Appendix of unpublished decisions, transcripts of bench rulings, rules, and other pertinent materials.



violating public policy – cover change-of-employment informational contacts. There is no ground for an injunction here, and the Court should deny Merrill's motion in its entirety.

## LAW AND ARGUMENT

> There is no power the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing [of] an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages.[2]

Thus, a preliminary injunction is an "extraordinary exercise of judicial power [to be] used only in the most compelling cases."[3] As the United States Supreme Court cautions, it is an "extraordinary and drastic remedy ... that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."[4] Merrill Lynch has not made the requisite "clear and unequivocal" showing. Nor could it. This is not one of those rare, "compelling" cases justifying the remedy of extraordinary injunctive relief. The Court therefore should deny Merrill's motion.

### I. Merrill Lynch Cannot Demonstrate A Clear Showing Of A Substantial Likelihood Of Success On The Merits.

#### A. Mr. Pignotti has not solicited any clients.

As is clear on its face, the Merrill Lynch contract at issue does not prohibit Mr. Pignotti's post-termination, change-of-employment informational contacts with clients.[5] Instead of banning *all* competition and prohibiting *all* contact or communication with customers, Merrill's agreement only proscribes contact that is a "solicitation," defined by Merrill in its contract as:

> any contact or communication of any kind whatsoever for the purpose of inviting, encouraging, or requesting any account ... (a) to transfer from Merrill Lynch to me or to my new employment, or (b) to open a new account with me or ... my employer, or (c) to otherwise discontinue its patronage and business relationship with Merrill Lynch.

---

[2] Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union Number 18, 471 F.2d 872, 876 (6th Cir. 1972), cert. denied, 411 U.S. 967 (1973).

[3] Merrill Lynch v. E.F. Hutton & Co., 403 F. Supp. 336, 339 (E.D. Mich. 1975).

[4] Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).

[5] Merrill Lynch v. Oblon, No. 99 C 5968, App. 6 at 10-12 (N.D. Ill. Sept. 10, 1999) ("The [Merrill Lynch] employment agreement does not prohibit contacts that are informative contacts, contacts that merely inform the customer.").

Merrill Lynch Employment Agreement, ¶2. Were there any ambiguity in the term "solicitation," the ambiguity would have to be resolved against Merrill Lynch as the drafter of the contract.[6]

Mr. Pignotti has not solicited any of his clients to leave Merrill Lynch and to transfer their accounts to Smith Barney. Indeed, Mr. Pignotti has initiated no contact with his clients other than to disclose to them the plain fact of his change of employment. Mark Pignotti is a registered representative licensed to sell securities to public customers, and he works in an industry heavily regulated by various agencies and organizations such as the Securities Exchange Commission, the National Association of Securities Dealers, Inc., the New York Stock Exchange, the State of Illinois, and other securities regulatory bodies. As a registered representative and financial consultant, Mr. Pignotti is charged with recognized legal, regulatory and industry obligations to his clients, especially the duty to disclose material information to them. Therefore, Mr. Pignotti is *obligated* to inform his clients that he has changed places of employment so that his clients – whose intimate, ongoing financial needs have been serviced by Mr. Pignotti – are able to contact him if they so choose. This is especially important during these uncertain times of "bearish" and volatile financial markets.[7]

Thus, Mr. Pignotti has advised his clients of his new employment affiliation. (See Pignotti Aff., §C & Ex. A.) Numerous industry arbitrators – much like those who will be resolving the merits of this dispute – have upheld the propriety of such informational contacts with clients, even in the face of restrictive covenants like the one present here.[8] Any prohibition

---

[6] E.g., Merrill Lynch v. Hafner, App. 1 at 12 ("If there is an ambiguity about what 'solicitation' is, guess what? Contra proferentum. Who drafted that one?"); Duldulao v. Saint Mary of Nazereth Hospital Center, 115 Ill. 2d 482, 493, 505 N.E.2d 314, 319 (Ill. 1987).

[7] See, e.g., Merrill Lynch v. O'Connor, No. 00 C 2065, App. 7 at 3 (N.D. Ill. Apr. 12, 2000) ("Certainly, at a time when the markets have been as volatile as in recent weeks, it would disserve the interests of customers to prohibit, pending a decision by an arbitration panel, even an informational announcement through an interpretation of the contract that even notification of a broker's change of address was not permitted.").

[8] See, e.g., H&R Block Financial Advisors, Inc. v. Moore, NASD No. 01-01893, App. 18 at 3 (Apr. 20, 2001) ("Mere notification by way of an announcement sent to past customers advising them of an employee's change of employment and providing those customers with the employee's new address does not violate any contractual restrictive employment agreement, nor does such action breach any fiduciary duty."); H&R Block Financial Advisors, Inc. v. Carmack, NASD No. 00-05576, App. 3 at p.3, ¶B (Dec. 22, 2000) ("In the majority of jurisdictions, the rule concerning restrictive employment agreements holds that a departing employee does not violate that agreement or breach any fiduciary duty by sending an informational announcement to customers advising of a change in employment and a notice of where he may be reached. Absent more, such an announcement is not a solicitation within the proscription of the employment agreement."); Merrill Lynch v. Bobrowicz, NASD No. 00-04349 (Award Oct. 4, 2000)

on providing such material information to customers would be an unenforceable restraint of trade because such a prohibition cannot protect any legitimate interest of a securities brokerage firm charged with the duty of providing full disclosure to public customers.[9]

Like industry arbitrators, courts in Chicago also have repeatedly held that Merrill's non-solicitation agreement does not prohibit change-of-employment informational contacts with clients, whether by written announcements or telephone calls, because the ***content*** of the communication is basic information about the broker's new work address and phone numbers, and nothing else. For example, in denying Merrill's request for a TRO against another departing broker, a federal judge in Chicago recently held that the broker's oral and written informational contacts with his customers were not solicitations under the Merrill agreement:

> [T]his just echoes what a lot of judges have done here and elsewhere ... an informational communication about where the person who has been handling the account has gone or now is, is something that's separate from solicitation. Indeed, to define 'solicitation' broadly in a way that would not give the freedom of contract as it should be given to the person who is the investor would I think strongly disserve the public interest, which is paramount in all of this stuff.

Merrill Lynch v. Hafner, supra, App. 1 at 5-7. Likewise, another Chicago federal judge held that the informational contacts (both oral and written) made by eight departing brokers were not "solicitations" under the same Merrill restrictive covenant that is at issue here:

> Based on that fact, the announcement of the broker that the broker has gone to Salomon Smith Barney, providing the phone number and other information ... it is my ruling that that type of contact is not for the purpose of inviting, encouraging, or requesting any account to transfer from Merrill Lynch, or to open a new account at Salomon Smith Barney, or to otherwise have the customer of Merrill Lynch discontinue its patronage from Merrill Lynch, or its business relationship with Merrill Lynch.

---

(App. 10); Choksi v. Merrill Lynch, NASD No. 97-05701 (Order Dec. 10, 1997) (App. 11) ("Claimant may send the announcement card that is attached to their Statement of Claim as Exhibit "B" to all of their clients that he personally serviced while at Respondent. Respondent will immediately provide Claimant with a list of their clients' names and addresses for this purpose."); Nolen v. Merrill Lynch, NASD No. 98-01012 (Order Mar. 23, 1998) (App. 12) (permitting use of announcement cards); Martin v. Merrill Lynch, NASD Arb. 98-02225 and Merrill Lynch v. Martin, NASD Arb. 98-02209 (Orders June 24 & June 30, 1998) (App. 13).

[9] See Merrill Lynch v. Pinzker, No. 98 C 7979, App. 9 at 8-9 (N.D. Ill. Dec. 15, 1998) ("public would be best served by a financial institution such as Merrill Lynch, a financial institution such as Salomon Smith Barney, and individuals in the financial industry ... providing full information to the customers regarding any individual that those customers previously had a relationship with").

The notice is for the purpose of informing the customer that the broker with whom the customer has been working at Merrill Lynch has moved to Salomon Smith Barney, and since its for the purpose of informing, and since informing is not one of the restricted purposes in the Merrill Lynch financial consultant employment agreement, I believe that type of contact is not a violation of that employment agreement by the defendants.

\* \* \*

The employment agreement does not prohibit contacts that are informative contacts, contacts that merely inform the customer.[10]

These holdings apply equally here, where Mr. Pignotti did nothing on an unsolicited basis – either orally[11] or in writing – more than to inform his clients of his new employment affiliation. For this reason standing alone, Merrill's injunction motion should be denied.

---

[10] Merrill Lynch v. Oblon, App. 6 at 10-12; see also Merrill Lynch v. O'Connor, App. 7 at 3 ("[T]he better reasoned decisions have held that a simple announcement is outside the restrictions of this [non-"solicitation"] language. ... Otherwise customers with longstanding trust in their brokers with immediate need of advice would not be able to contact them. Various courts in other jurisdictions have reached the same conclusion."); Merrill Lynch v. Pinzker, No. 98 C 7979, App. 8 at 19-22 (N.D. Ill. Dec. 11, 1998) (emphasis added) ("[The Pinzker] announcement appears to me ... to not engage in any of the prohibited activity.... What this announcement articulates is that Mr. Pinzker has joined Salomon Smith Barney, and it would be up to the account to make the determination of what to do as a result of this information.... *The restrictive covenant doesn't say there will be no contact, the restrictive covenant does not say there will be no communication.*").

[11] Courts specifically recognize that oral informational contacts, like written informational contacts, are not solicitations because, again, it is the *content* of the communication that matters, not the method of the communication. E.g., Merrill Lynch v. Gurtin, No. 99 C 406, App. 4 at 40-41 (N.D. Ill. Jan. 27, 1999) ("I do not believe that the fact that the solicitations are oral, one on one, whether in person or by telephone, somehow taints them immeasurably as far as characterizing them as solicitations as opposed to some neutral announcement."); Merrill Lynch v. Hafner, App. 1 at 11-12 (In the securities "industry, the whole notion that is involved here ought to be freedom of choice on the part of the customers, on the part of the clients. And informing them – if there is someone with whom the broker has a relationship, and if hearing the broker's voice is somehow an inducement to the client to stay with the broker, something that the client would have done in any event upon being given the choice, ... to characterize that as malum in se or malum prohibitum as something that constitutes an invalid solicitation, is something ... I would not be persuaded by in those terms."); Merrill Lynch v. McDowell, No. 00 CV 1483, App. 14 at 3-4 (Wis. Cir. Ct. June 2, 2000) (holding that sending out an announcement and telephoning customers to advise them only of a broker's new business address and phone numbers is *not* a "solicitation" that violates the Merrill contract); Merrill Lynch v. Pinzker, App. 9 at 2-3 (telephone contacts with customers notifying them of a broker's new employment affiliation do not change the fact that they are informational announcements and not solicitations under the Merrill contract); Wells v. Merrill Lynch, 919 F. Supp. 1047, 1053 (E.D. Ky. 1994) ("informational contact ... consisting of any written or oral contact that provides information about the [brokers'] whereabouts and how they may be contacted does *not* constitute solicitation."); Merrill Lynch v. Fowler, No. CA 99-3000 JR, App. 16 at 6, 14-15 (D.D.C. Nov. 15, 1999).

**B.**     **Merrill has no protectable interest in Mr. Pignotti's customers.**

Merrill Lynch will not succeed on the merits for another reason: it has no protectable interest in preventing Mr. Pignotti from informing his clients that he has gone to another brokerage firm. Merrill Lynch does not "own" the clients, nor does it own the clients' assets. "As a general rule in Illinois, an employer ordinarily has *no* protectable interest in its clients." Audio Properties, Inc. v. Kovack, 275 Ill. App. 3d 145, 148, 655 N.E.2d 1034, 1037 (1st Dist. 1995) (citation omitted; emphasis added). There are only two situations where a protectable interest of an employer may be found for purposes of enforcing a non-solicitation covenant:

> (1) where, by the nature of the business, plaintiff has a near-permanent relationship with its customers and but for his employment, defendant would not have had contact with them; or (2) where the former employee learned trade secrets or acquired other confidential information through his employment with plaintiff and subsequently attempted to use it for his own benefit.[12]

Merrill Lynch establishes neither.

First, Merrill Lynch cannot establish that it has a near-permanent relationship with Mr. Pignotti's clients. Approximately 70% of the clients Mr. Pignotti services are client relationships that he personally developed and brought to Merrill Lynch – from his own independent cold-calling and networking efforts; from family, friends and acquaintances; from referrals from such clients; etc. (See Pignotti Aff. §B.) These clients are not pre-existing Merrill clients who Merrill gave Mr. Pignotti to service. These clients came to Merrill Lynch because of Mr. Pignotti, not because of Merrill Lynch.[13]

Courts generally accept the proposition that a restrictive covenant is *not* enforceable with respect to clients that – as is the case here – came to the former employer as a result of the

---

[12] Trailer Leasing Co., 1996 WL 392135, at *1, *5 (citations omitted). See also Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc., 292 Ill. App. 3d 131, 141-42, 685 N.E.2d 434, 443 (2d Dist. 1997); Abbott-Interfast Corp. v. Harkabus, 619 N.E.2d 1337, 1341 (Ill. 1993).

[13] See Merrill Lynch v. Pinzker, App. 9 at 3-5 (finding that Merrill did not have a near-permanent relationship in customers that were serviced by broker, because he developed them by making personal cold calls that did not involve a "laborious method of prospecting" by Merrill Lynch); Reinhardt Printing Co. v. Feld, 142 Ill. App. 3d 9, 17, 490 N.E.2d 1302, 1308 (1st Dist. 1986) (involving former employee who testified that he developed all but approximately 17 of the 76 accounts he serviced by cold calls from sources such as the "Yellow Pages" and office building directories; appellate court held that plaintiff had no near-permanent relationship with these customers "whose business he was able to solicit not *because* of his association with plaintiff, but, rather, through his own efforts on plaintiff's behalf and in furtherance of his association with it." (citation omitted)).

former employee's efforts.[14] To enforce a restrictive covenant as to a former employee's *personal* clients would improperly permit the former employer "to appropriate goodwill created and maintained through [the former employee's] efforts, essentially turning on its head the principal justification to uphold any employee agreement not to compete based on protection of customer or client relationships."[15] Moreover, Merrill has no near-permanent relationship under Illinois law with respect to clients referred to Mr. Pignotti from other clients.[16]

With respect to the second prong of the protectable interest test, Merrill cannot establish that the names, addresses or phone numbers of Mr. Pignotti's customers constitute Merrill Lynch's confidential information. This information was already known to Mr. Pignotti since he was the one who personally developed and brought these clients to Merrill, at no great expense to Merrill. "Under Illinois law, customer lists and other customer information will constitute confidential information *only* when the information has been developed *by the employer over a number of years at great expense* and kept under tight security."[17] That is not the case here. Furthermore, Mr. Pignotti's clients' addresses and phone numbers are "easily obtainable through

---

[14] E.g., Audio Properties, Inc., 275 Ill. App. 3d at 148, 655 N.E.2d at 1037; Lawrence & Allen, Inc., 292 Ill. App. 3d at 141-42, 685 N.E.2d at 443; Abbott-Interfast Corp., 619 N.E.2d at 1341; BDO Seidman v. Hirshberg, 690 N.Y.S.2d 854, 859-60 (N.Y. 1999) ("[It] would be unreasonable to extend the covenant to personal clients of defendant who came to the firm solely to avail themselves of his services and only as a result of his own independent recruitment efforts, which [the former employer] neither subsidized nor otherwise financially supported…. Because the goodwill of these clients was not acquired through the expenditure of [the former employer's] resources, the firm has no legitimate interest in preventing defendant from competing for their patronage."); Valley Medical Specialists v. Farber, 982 P.2d 1277, 1285 (Ariz. 1999) ("[T]he employer's interest in its customer base is balanced with the employee's right to the customers. Where the employee took an active role and brought customers with him or his to the job, courts are more reluctant to enforce restrictive covenants.").

[15] BDO Seidman, 690 N.Y.S.2d at 859-60.

[16] See Merrill Lynch v. Berg, App. 19 at 3. See also LSBZ Inc. v. Brokis, 237 Ill. App. 3d 415, 429, 603 N.E.2d 1240, 1250 (2d Dist. 1992); Merrill Lynch v. Novak, App. 2 at 6-7, 9-10; Audio Properties, Inc., 275 Ill. App. 3d at 151, 655 N.E.2d at 1038-39 (Plaintiff "has not shown that the clients who use [its] studios are its customers, rather than the customers of individual sound engineers who service them. [R]epeat clients specifically request sound engineers by name for subsequent engagements. [Defendant] is one of the sound engineers who has developed such a following."); Springfield Rare Coins Galleries v. Mileham, 250 Ill. App. 3d 922, 938, 620 N.E.2d 479, 490 (4th Dist. 1993) (Rejecting argument that the former employer's reputation was responsible for developing the customers: "No [customer] testified that they would not have done business with [the employee] had he not been affiliated with [the former employer].").

[17] Springfield Rare Coin Galleries, 250 Ill. App. 3d 922, 930, 620 N.E.2d 479, 485 (emphasis in original). See also A. J. Dralle, Inc. v. Air Technologies, 255 Ill. App. 3d 982, 991-92, 627 N.E.2d 690, 697 (2d Dist. 1994); Reinhardt Printing Co., 142 Ill. App. 3d at 18, 490 N.E.2d at 1308.

normal resources (e.g., telephone directories)" and internet search engines.[18] Therefore, the identities of Mr. Pignotti's customers are not Merrill's confidential information or trade secrets. Indeed, an employee is free to take customer names and other customer information upon leaving to join another firm because "[a]ny other rule would force a departing employee to perform a prefrontal lobotomy on himself or herself."[19]

Accordingly, the restraints sought by Merrill Lynch in this case are not aimed to protect any information which could constitute "confidential" or "trade secret" information.[20] Because Merrill cannot establish a protectable interest in preventing Mr. Pignotti from announcing to his clients his new professional affiliation, Merrill's request for injunctive relief should be denied.

## II. Merrill Lynch Has Not Established That It Will Suffer Irreparable Injury If the Requested Relief Is Not Granted.

Merrill Lynch also fails to carry its separate burden of proving that it will suffer irreparable harm pending the parties' mandatory, expedited securities industry arbitration. A party may not obtain injunctive relief without establishing that its remedies at law are inadequate.[21] Here, any purported harm to Merrill Lynch as a result of Mr. Pignotti's actions may be fully compensated by a money damages award in arbitration.

---

[18] Moss, Adams & Co. v. Shilling, 179 Cal. App. 3d 124, 129-30 (Cal. App. 1986).

[19] Fleming Sales Co., 611 F. Supp. 507, 514 (N.D. Ill. 1985); see also Amex Distrib. Co. v. Mascari, 724 P.2d 596, 603 (Ariz. App. 1986) ("an alert salesman is not required to undergo a prefrontal lobotomy").

[20] This is true even in those cases where a "client list" that might be deemed proprietary was taken and used to make change-of-employment notifications. See, e.g., Moss, Adams & Co., 224 Cal. Rptr. at 457. American Credit Indemnity Co. v. Sacks, 262 Cal. Rptr. 92, 99 (Cal. App. 1988) ("[E]ven when a trade secret customer list exists, the common law cases acknowledge a right to announce a new business affiliation as contrasted with a solicitation for patronage"); Hilb, Rogal & Hamilton Ins. Services v. Robb, 39 Cal. Rptr. 2d 887, 892 (Cal. App. 1995) (even if customer information was a trade secret, plaintiff "lawfully informed ... clients of their change in employment and then complied with their instructions to move their accounts...."); Williams v. Riedman, 2000 WL 225523 at *16 (S.C. App. Feb. 28, 2000) (same); Carriage Hill Health Care, Inc. v. Hayden, 1997 WL 833131 at *7 (D.N.H. Apr. 30, 1997) (salesmen "entitled" to use former employer's customer information to "announce their new affiliation" with competitor, even if information was a trade secret).

[21] Merrill cannot obtain an injunction solely on the basis of a contractual stipulation for injunctive relief; Merrill nonetheless must still show irreparable harm. A contractual stipulation to injunctive relief is unenforceable because "[i]t is improper ... to enforce a non-competition clause merely because the parties agreed to such an arrangement." Advent Electronics, Inc. v. Buckman, 112 F.3d 267, 274 (7th Cir. 1997) (Illinois law). See also Smith, Bucklin & Associates, Inc. v. Sonntag, 83 F.3d 476, 481 (D.C. Cir. 1996) (a contractual stipulation to injunctive relief "is an insufficient prop") (citation omitted); Baker's Aid v. Hussmann Foodservice Co., 830 F.2d 13, 16 (2d Cir. 1987) (same).

The securities industry is unique because, as a matter of regulated, mandated practice, records must be kept and maintained regarding the revenue generated *to the penny* for each customer account.

> The securities industry is highly regulated. Each individual transaction is monitored electronically. Every customer transfer from [Merrill Lynch] is documented. Every executed trade is recorded. Every dollar earned in fees by Defendants doing business with those customers that [Merrill Lynch] considers its own can be traced precisely. Any loss [Merrill Lynch] might suffer as a result of Defendants' departure is calculable.

Morgan Stanley DW, Inc. v. Frisby, 163 F. Supp. 2d 1371, 1376 (N.D. Ga. 2001) (denying motion for TRO against brokers who signed non-solicitation agreement). Therefore, as a Michigan court explained:

> [I]t certainly is going to become clear, and quickly so, just how many clients follow [Defendant] to [his] new employer, [Smith Barney]. It isn't going to take any magic solution for Merrill Lynch to figure that out. It would be relatively easy, in this Court's considered judgment, to make an assessment of how many dollars in commissions these clients would have generated for Merrill Lynch had they not transferred their accounts, by using past commissions, formulas and averages which must certainly exist in the investment industry such as this.

Manaia v. Merrill Lynch, No. 93-CV-74226-DT, App. 17 at 30 (E.D. Mich. Oct. 18, 1993).[22] Thus, to the extent that Merrill Lynch could prove that Mr. Pignotti somehow wrongfully diverted clients from Merrill, such resultant losses would be *readily* quantifiable by the panel of three NASD securities industry arbitrators who will hear and decide this case on the merits.[23] As a Chicago federal judge held last year:

---

[22] See also Merrill Lynch v. De Liniere, 572 F. Supp. 246, 248-49 (N.D. Ga. 1983) (denying injunction); Merrill Lynch v. E.F. Hutton & Co., 403 F. Supp. at 344 (denying injunction and stating, "[Merrill's] claim that the loss of primary commissions is unascertainable is conclusory and does not comport with prevailing concepts of damages. Its alleged loss of secondary customer referrals would, if proven, be calculable."); Merrill Lynch v. Schlender, No. 98-32079, App. 15 at 42 (Mich. Cir. Oct. 16, 1998) ("Any harm to Merrill Lynch I think is finite. I think it is subject to calculation in the event that damages are awarded.").

[23] E.g., American Express Financial Advisors v. Hahn, Civil Action No. 98-M-2046, App. 20 at 4 (D. Col. May 24, 1999) ("Injunctive relief is not appropriate here because the Plaintiff has an adequate remedy at law to recover damages for breach of contract available in the NASD arbitration proceeding.... There are adequate records from which a loss in revenues and fees from investment products, financial planning fees and brokerage fees can be calculated for those investors who switched from the plaintiffs' proprietary products and other investments as a result of the efforts of the defendants to induce such actions upon their decision to leave their affiliation with the plaintiff."). See also Merrill Lynch v. O'Connor, App. 7 at 3 ("On irreparable harm, the amount of commissions generated from clients leaving

> [O]ne thing we know about the brokerage situation is that the money aspect of it is defined. It's on a per-customer basis. The numbers of dollars involved [a]re ascertainable. If [the broker] breaches his obligations and has been found to breach his obligations, the harm to Merrill Lynch is really measurable in terms of the lost commissions from those same customers.

Merrill Lynch v. Hafner, App. 1 at 7-8 (denying Merrill's injunction request).[24]

This availability of a calculable dollar-and-cents remedy is reason enough for this Court to deny injunctive relief.[25] Moreover, any alleged uncertainties supposedly resulting from lost future referrals do not render damages incalculable for purposes of "irreparable injury" analysis.[26] Nor do assertions of lost goodwill[27] or office disruption.[28] A mere showing of loss of

---

Merrill Lynch to go with O'Connor to their new job can be readily ascertained."); Merrill Lynch v. Novak, App. 2 at 6 ("For the most part, any losses that are ultimately established in terms of lost commissions or lost business *can be easily quantified*, at least in the short run. To the extent that there are arguable losses here beyond commissions or other things which can be *easily quantifiable*, it is not clear that those things really exist at this point. It is not clear if they're going to exist over the next several months whether they will exist in the short run, *and it is not clear that those kinds of damages are going to present any issues of violation that are beyond the kind of things that we do have to struggle with from time to time* in civil proceedings." (emphases added)).

[24] In Merrill Lynch v. Bishop, 839 F. Supp. 68 (D. Me. 1993), the court denied another Merrill injunction request in a non-solicitation case, and rejected the very "irreparability" arguments that Merrill is making to this Court, saying that Merrill's arguments rested on case opinions with "*no reasoned consideration*" and therefore "*of no persuasive value.*" Id. at 72 (emphases added). The Bishop Court went on to hold that Merrill Lynch cannot carry its burden of proving irreparable harm in cases like this because "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, *weighs heavily against a claim of irreparable harm.*" Id. at 73-75 (emphasis added) (citing Sampson v. Murray, 415 U.S. 61, 91-92 (1974)).

[25] Merrill Lynch v. McDowell, App. 14 at 3 ("But my reasons for not entering the injunction today are that I don't believe it has been demonstrated that there is an irreparable harm. It seems to me that a dollar figure can be put on the harm through statistics, through histories, through past practices. I would think experts could very easily project and predict what would have been lost by each lost account."). See also Automated Marketing Systems, Inc. v. Martin, 467 F.2d 1181, 1183-84 (10th Cir. 1972) (Even "if customers had been obtained in violation of a restrictive covenant ... the remedy of law will still give [plaintiff] adequate recourse.").

[26] E.g., Merrill Lynch v. E.F. Hutton, 403 F. Supp. at 344 ("As to the assertions of lost profits, it is clear that plaintiff has adequate legal recourse. Its claim that the loss of primary commissions is unascertainable is conclusory and does not comport with prevailing concepts of damages. Its alleged loss of secondary customer referrals would, if proven, be calculable."); Manaia v. Merrill Lynch, App. 17 at 30 ("The Court is also not troubled frankly, by the potential referrals which these "stolen" clients may have made in years to come. If such aspect of damages is not found to be speculative and theoretical, the Court is confident that the finder of fact can ascertain an appropriate figure to compensate Merrill Lynch for their loss. I don't see any problem with that.").

[27] First of Michigan Corp. v. Hilliard-Lyons, Inc., No. 1:97-CV-947, App. 5 at 62 (W.D. Mich., Nov. 13, 1997) (dissolving ex parte TRO) ("[E]very time there is a spat or a dispute between business entities, there is always the possibility of loss of goodwill as a result of publicity and other things. So [a] loss of goodwill,

earnings or damage to reputation "falls *far short* of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case." Bishop, 839 F. Supp. at 73. Therefore, Merrill Lynch cannot demonstrate the critical element of irreparable harm, and so its request for extraordinary equitable relief must be denied.

### III. The Balance Of Equities Weighs In Favor Of Mr. Pignotti.

Merrill Lynch also fails to carry its burden of proving an overriding harm to it, and that the equities in this case weigh in its favor. Contrary to Merrill Lynch's assertions, the entry of an injunction would not act to preserve the status quo. The status quo immediately preceding this litigation was that Mr. Pignotti's clients had the ability to exercise their freedom of choice to communicate and consult – without any hindrance – with Mr. Pignotti. Any type of restraint or limitation on the normal ability of clients to contact and consult with the financial advisor of their choice "has a *disruptive impact on the status quo*."[29] It "really *alters the status quo materially*."[30] And in doing so, any restraint would needlessly cause third-parties who are not before the Court undue anxiety and hardship, especially during these times of market tumult.

Separately, Merrill unilaterally and fundamentally changed Mr. Pignotti's employment by implementing its FAC policy, thereby defeating any claim on equity Merrill might hope to assert. (See Pignotti Aff. §A.) As the Honorable Milton Shadur of the Northern District of Illinois emphasized in denying Merrill Lynch's request for a TRO against another broker who left Merrill Lynch in part because of FAC, "He who seeks equity must do equity":

> If you have a situation in which there has been a meaningful change in the dynamics, in the economics of the presentation of the brokerage business in a way that may impact adversely in the perception of an individual broker, then it seems to me that in a way the rules of the game have changed.

---

I would submit, is not a very sound basis to premise injunctive relief on, particularly when one sees that this is a money business. This is a business that has calculable numbers. This is a business that in fact – profession that in fact it can be quickly quantified.").

[28] Manaia, App. 17 at 34 ("[The] third concern expressed by Merrill ... is that injunctive relief is necessary to protect the stability of the Bloomfield Hills office and to discourage other competitors from buying away Merrill Lynch employees. Well, I think that complaint amounts to not much more than remarks that are made about and over *natural competition* that exists in the marketplace." (emphasis added)).

[29] Merrill Lynch v. E.F. Hutton, 403 F. Supp. at 344.

[30] Hafner, App. 1 at 8 (Denying request for injunctive relief where, as here, "essentially what [Merrill is] asking is what [Merrill] would characterize as a maintenance of the status quo while the arbitration is going on, when in fact it sounds to me as though it really alters the status quo materially.").

Merrill Lynch v. Hafner, App. 1 at 6. Because Merrill has fundamentally changed the rules of the game and has undercut (instead of supported) Mr. Pignotti's business and his client relations, Merrill should not be permitted to come to this Court sitting in equity to seek an injunction against him.

Finally, Merrill Lynch – a global behemoth that generates billions of dollars in annual revenue – can hardly claim that it will be unable to sustain itself without an injunction in the short period before this matter is heard on the merits by an NASD arbitration panel. The risk posed to Mr. Pignotti should Merrill succeed in disrupting Mr. Pignotti's client relationships is proportionately far greater than any risk to Merrill. The commissions generated by Mr. Pignotti's clients are the sole means by which Mr. Pignotti supports his wife and infant son, but they constitute only a miniscule fraction of Merrill Lynch's total revenues. This disparity of hardship is yet another independent reason to deny Merrill's motion.[31]

### IV. The Injunction Request Is Contrary To The Public's Interests.

There are several public interests that counsel denial of Merrill's injunction request. The public has an interest in the construction of contracts *as they are written*, in the strict interpretation of restrictive covenants, and in the rejection of efforts (such as those by Merrill here) by employers to overreach the actual terms of their own standard contracts in order to impose onerous burdens and limitations on the conduct of former employees. The general public also has a legitimate interest in a competitive and freely-operating securities brokerage industry, with both financial consultants and brokerage firms being free to discuss and implement employment changes without anti-competitive intimidation or restraint.[32] And, of course, the

---

[31] Merrill Lynch v. De Liniere, 572 F. Supp. at 249 ("Because the effect of the loss of income pending the outcome of this dispute would, by reason of the differing financial strength of a large brokerage firm and an individual broker, bear far more heavily on [the broker] than on Merrill Lynch, that disparity of effect supports denial of an injunction."); Merrill Lynch v. E.F. Hutton, 403 F. Supp. at 344 (The "injury to defendants, when compared with the unsubstantiated harm to plaintiff, poses a legitimate concern."); O'Connor, App. 7 at 3; Gurtin, App. 4 at 42.

[32] Cf. Valley Medical Services, 982 P.2d at 1282 ("[I]n cases involving the professions, public policy concerns may outweigh any protectable interest the remaining firm may have."). See also Carter-Shields v. Alton Health Institute, 2000 Ill. App. LEXIS 861, *23 (5th Dist. Nov. 2, 2000) (finding restrictive covenant on a physician against public policy because of the public interest in "an individual's freedom to select a preferred system of health care and free competition among physicians and alternative systems of care are prerequisites of ethical practice and optimal patient care"(citations omitted)); Dowd & Dowd, Ltd. v. Gleason, 181 Ill. 2d 460, 481, 693 N.E.2d 358, 369 (1998) (finding a two-year noncompete clause unenforceable as against public policy because it violated a rule of professional conduct for lawyers

public has an interest in ensuring that the needs and desires of public brokerage customers are not superceded and overridden by anti-competitive desires of brokerage firms engaged in employment disputes with former brokers.[33]

Client relationships are "uniquely personal in the brokerage business."[34] The special, intimate character of the relationship arises out of the client's detailed sharing of his or her financial situation and objectives, and out of the broker's conscientious servicing and protection of the client's particular needs. The important and special nature of the broker-client relationship – characterized by a bond of trust earned and given – is frequently emphasized by courts when denying injunction requests similar to the one made by Merrill Lynch here.[35] Indeed, aspects of the relationship can be fiduciary in nature, and the character of the relationship thus warrants particular weight in the injunction context.[36]

The public interest in this case lies with the public customers who have relied on Mr. Pignotti's advice and guidance over the years. Mr. Pignotti developed close, personal working relationships with his customers and is familiar with each of their individual investment holdings and goals. The clients' interest is "particularly critical" because "[m]ost have relationships with

---

"designed both to afford clients greater freedom in choosing counsel and to protect lawyers from onerous conditions that would unduly limit their mobility." (citations omitted)).

[33] The NASD itself recognizes the primacy of investor choice and the public interest in barring any interference with a customer's effective exercise of his or her freedom of choice. This is evident in the rule that the NASD adopted and implemented earlier this year to prohibit member firms such as Merrill Lynch from interfering with an investor's right to transfer his or her brokerage account to his or her broker's new securities firm. (See App. 21 (NASD Notice To Members).) Discussing the rule, the Chairman and CEO of the NASD explained, "It is a fundamental right of an investor to choose with whom he or she does business, and the fact that a broker changes firms should not affect an investor's ability to continue to access his or her account and to do business with that broker." (App. 22 (NASD Press Release).)

[34] Merrill Lynch v. Gurtin, App. 4 at 42-43 ("[Y]ou have to consider the public interest in competition and in relationships that are, I think, fairly uniquely personal in the brokerage business. I think if any of us here were to call our broker and find that he had disappeared, we'd be pretty upset, even though the company may be as reputable and fine a company as Merrill Lynch. Our relationships with these companies is generally very personal through the broker.").

[35] E.g., Prudential Securities, Inc. v. Plunkett, 8 F. Supp. 2d 514, 520 (E.D. Va. 1998) ("A broker-client relationship, like a lawyer-client or doctor-patient relationship, is a personal relationship dependent on personal trust. Clients should be free to deal with the broker of their choosing ....") (denying injunction).

[36] Merrill Lynch v. De Liniere, 572 F. Supp. at 249 ("A stock broker stands in a different relationship to his customers from that of other kinds of salesmen, and fiduciary duties of a broker are recognized in law because of the important role of the broker in protecting the financial welfare of his clients. The public's ability to choose the professional services it prefers is central to the consideration of this criterion of injunctive relief." (quotation omitted)).

people. And it's really their call as to where they want to [go] and where they want to stay in terms of their investment matters." Merrill Lynch v. Hafner, App. 1 at 5.

> Each member of the affected public has a right to learn that the broker with whom he has entrusted his accounts, is no longer servicing his accounts because she has gone to another brokerage firm. It is in the best interest of the public, therefore, that these affected clients be informed of Ms. McCullen's move so that they might decide on their own whether to follow her to Prudential or to stay with Merrill Lynch to be serviced by another broker there. Merrill Lynch is not restricted in any way from in good faith attempting to convince these clients to keep their accounts at Merrill Lynch but ultimately it is each client's own informed decision to make. Therefore, the court cannot find that the denial of [Merrill Lynch's request for] injunctive relief against the [broker] would be contrary to the public interest.[37]

To grant injunctive relief here would hinder -- or possibly even effectively deny -- each of these clients the right to choose to continue their personal relationship with the broker of their choice, Mr. Pignotti. If there were a wrong here -- and there is not -- the proper remedy would be money damages, not injunctive relief. Money damages would give proper regard to public customers' freedom of choice. An injunction would not.

### Conclusion

Accordingly, for each of the foregoing reasons, the Court should deny in its entirety Merrill Lynch's motion for injunctive relief.

Dated: May 14, 2003.

Respectfully submitted,

MARK A. PIGNOTTI, Defendant

By: _____
One of his Attorneys

Jerry M. Santangelo
Brad Twedt
NEAL, GERBER & EISENBERG
Two North LaSalle Street
Chicago, Illinois 60602
(312) 269-8000
(312) 269-1747 (fax)
Firm I.D. No. 13739

---

[37] Merrill Lynch v. McCullen, 1995 WL 799537, *3 (S.D. Fla. 1995).

## CERTIFICATE OF SERVICE

Brad Twedt, an attorney, certifies that on this 14th day of May, 2003, he caused a copy of the foregoing ***Defendant's Brief in Opposition to Plaintiff's Motion for Injunctive Relief***, together with the supporting ***Appendix,*** to be served by messenger delivery upon the following attorney, who is counsel of record for the plaintiff:

Peter G. Hallum, Esq.
SEIDLER & McERLEAN
One North Wacker, Suite 4125
Chicago, IL 60606

Brad Twedt

NGEDOCS:07239N.0963.844141.3

# SEE CASE FILE FOR EXHIBITS